## SUPREME BENCH OF BALTIMORE CITY.

Filed May 29, 1901.

IN THE MATTER OF AUGUSTIN J. QUINN AND CHARLES WINTERNITZ, ATTORNEYS AT LAW.

*Arthur George Brown* and *Charles J. Bonaparte* for The Baltimore Bar Association.

*Wm. L. Marbury, William S. Bryan, Jr.*, and *Isaac Lobe Straus* for respondents.

Argued before HARLAN, C. J., PHELPS, WRIGHT, DOBLER and STOCKBRIDGE, JJ.

PHELPS, J.—

This is a disciplinary proceeding against two members of the Baltimore Bar practicing as partners under the firm of "Quinn & Winternitz." The charges are preferred by the Orphans' Court of Baltimore City, in pursuance of the Act of 1900, Chapter 509. In general, they are charged with unprofessional conduct, malpractice and fraud, in their dealings with Edward McC. Harbaugh, a citizen of Illinois, sole distributee of his deceased brother, Charles L. Harbaugh, late a resident of Baltimore, in connection with the settlement of the decedent's personal estate in the Orphans' Court.

The charges were filed on the 23rd November, 1900, and are as follows:

In the Orphans' Court of Baltimore City, "Edward McC. Harbaugh vs. Casper F. Jones, administrator, et al."

To the Honorable, the Judges of the Supreme Bench of Baltimore City.

In pursuance of the Act of Assembly of the Session of 1900, Chapter 309, we, the Judges of the Orphans' Court of Baltimore City, hereby charge that Augustin Quinn and Charles Winternitz, attorneys-at-law and members of the Baltimore Bar, being partners under the name of Quinn & Winternitz, have been guilty of unprofessional conduct as disclosed in the proceedings and testimony in the case of Edward McC. Harbaugh vs. Casper F. Jones, administrator, et al., recently heard in this Court.

(1) In that they induced Edmund J. McGraw, an appraiser in the Orphans' Court of Baltimore City, by paying to him a sum of money and his expenses, to accompany Charles Winternitz to Springfield, Illionis, and there to see Edward McC. Harbaugh, the sole distributee of the estate of his deceased brother, Charles Leonard Harbaugh, which estate was being administered in this Court, and that they thereby gained the assistance of said appraiser in obtaining by misrepresentation, deception and fraud, a power of attorney and an agreement to pay Quinn & Winternitz on unreasonable and unconscionable percentage of the value of said estate for professional services to be rendered.

(2) In that the said Augustin Quinn and Charles Winternitz entered into an unlawful agreement with Casper F. Jones, administrator of the aforesaid estate, whereby the said administrator retained of the moneys in his hands a large sum as commissions over and above the commissions allowed by this Court, and also a fee for his counsel, the said Quinn and Winternitz well knowing that said commissions and counsel fee were unreasonable and contrary to the statute law and the decisions of the Court of Appeals of this State, and in that they obtained the consent of Edward McC. 'Harbaugh to the retention of said money by said administrator by misrepresentation and concealment of facts, and by failing to advise him of the law and his rights thereunder.

(3) In that the said Augustin Quinn and Charles Winternitz received from Casper F. Jones, administrator, a large sum of money of the estate aforesaid as attorneys of said Edward McC. Harbaugh, said money being paid to them by said administrator as the amount to which said Harbaugh was entitled on a distribution of the cash in his hands, and the said Quinn and Winternitz fraudulently concealed from said Harbaugh knowledge of their receipt of a part of said money being paid to them by said administrator, and also fraudulently retained and refused to pay over to said Harbaugh a large portion of said sum of money to which he was lawfully entitled.

(4) In that the said Augustin Quinn and Charles Winternitz, during the entire time that the relation of attorney and client existed between them and said Edward McC. Harbaugh, fraudulently withheld from said Harbaugh professional advice concerning his rights and interest in the matter of the administration of the estate of his deceased brother, and by misrepresentation, deception and concealment of material facts, so controlled his mind as to deprive him of a free, intelligent and independent judgment and induced him to sign and make affidavit to papers filed in the case aforementioned, and by false and fraudulent devices deprived him of a large amount of money of the estate aforesaid, to which he, as sole distributee, is lawfully entitled.

(5) In that they practiced upon the said Edward McC. Harbaugh, by means of misrepresentation, deception, collusion and fraud, grievous wrongs to the great injury of the said Edward McC. Harbaugh, and to their personal and professional dishonor, and to the lessening and discredit of the dignity of the profession of the law.

GEORGE SAVAGE,
MYER J. BLOCK,
WM. J. O'BRIEN.

(Seal of the Orphans' Court.)

Thereupon a rule was laid upon the attorneys named to show cause why they and each of them should not be disbarred.

A separate sworn answer was filed by each of the attorneys on December 6, 1900, denying the said charges, all and singular and claiming entire innocence of all misconduct in reference to the matters referred to. The dealings between Mr. Winternitz and Edward McC. Harbaugh at Springfield, Illinois, which led to the execution by Harbaugh of the power of attorney and contract for fees, to be hereafter mentioned, are sent forth by Winternitz at large, as well as the subsequent transactions connected with the "quick settlement" of the estate of Charles L. Harbaugh and the release executed by Edward McC. Harbaugh.

After a detailed, copious narrative, the answer takes up the charges preferred by the Orphans' Court *seriatim*, and specifically denies each of them.

The answer of Mr. Quinn is substantially to the same effect. He explains how Quinn and Winternitz came to be connected with the case, through information received from one Jubb, on July 6, 1900, that "a man by the name of Harbaugh had been found dead in his house on South Arlington avenue, and that he died possessed, as Jubb thought, of two houses in the neighborhood, and had left a brother surviving him who resided in the State of Illinois." He then goes on to show how, upon this information, after consultation with his partner, he sought and secured communication with the brother in Springfield, Illinois, by telegraph and then over the long-distance telephone, giving Harbaugh the first information he had received of his brother's death. Having thus succeeded in locating their man, the uninvited expedition to Illinois by Winternitz, accompanied by appraiser

McGraw, is more fully detailed in the answer of Winternitz.

The answer of Quinn is quite as specific as that of his partner in denials of guilt and protestations of innocence.

It is noticeable that in neither answer is any mention made of the three letters given by Jubb to Quinn, and the use of them in Springfield by Winternitz.

The respondents being ably represented by distinguished counsel, this Court, in accordance with its established practice in such cases, invited the Baltimore Bar Association to act as *amicus curiae* in support of the charges of the Orphans' Court in order that the matters in issue might be fairly and fully investigated under the ordinary conditions of forensic controversy.

Accordingly the Bar Association delegated two of its leading members to discharge this public duty, and this duty, no less painful and arduous, they have performed with much eminent ability, as well as such entire fairness, as to entitle them to the thanks, not only of the Court, but of the profession and the public. It is proper to acknowledge in this connection that the learned counsel for the respondents have shown all that devotion to the cause of their clients, and all that painstaking industry and professional skill which were to have been expected from gentlemen of their reputation.

The cause was set down for hearing on the 11th February, but was postponed at the instance of counsel for the respondents, in order to await the decision of the Court of Appeals in the case then pending before it of Jones, administrator, vs. E. McC. Harbaugh.

This appeal had been taken by Dr. Jones from the action of the Orphans' Court upon a petition filed August 20, 1900, by Harbaugh, charging Messrs. Quinn and Winternitz and others with a conspiracy to defraud him, and charging Dr. Jones, the administrator, with having "aided the above mentioned parties in the perpetration of the fraud." After a protracted trial the Orphans' Court decided that the charge of conspiracy was not sustained, but they removed from office their appraiser, McGraw, for what they considered a "gross impropriety" in allowing himself to be induced and paid by Winternitz to join him upon his excursion to Illinois in quest of Orphans' Court practice, and they further decided to prefer the charges against Messrs. Quinn and Winternitz, which are the subject of this present proceeding. At the same time a majority of the Orphans' Court removed Dr. Jones as administrator, and appointed Harbaugh in his place.

In reversing the order appealed from, removing Dr. Jones as administrator, the Court of Appeals, in their opinion through Judge Boyd, April 10, 1901, make the following reservation as regards the respondents:

"As the record shows that proceedings have been instituted against Messrs. Quinn and Winternitz and others, we do not intend, in what we say, in any manner to pass upon the questions therein involved, or determine whether they were guilty of the fraud charged against them, but will as far as possible, confine ourselves to the action of the Court below in removing the appellant and appointing the appellee in his place—that being the subject before us."

The reserve thus indicated being carefully maintained throughout, there is nothing to be found in the opinion of the Court of Appeals in the case of Jones vs. Harbaugh, to relieve this Court in any degree of the labor of now investigating and determining these charges upon its own unaided responsibility, with the single exception of the second specification.

At the trial, a preliminary motion was interposed on behalf of the respondents, and fully argued, to quash the proceedings, upon several grounds, the substance of which will sufficiently appear from the terms of the order overruling the motion.

## Conclusions.

I. That the pendency of the equity case of Harbaugh vs. Quinn, Winternitz et al., in the Circuit Court No. 2, is not a sufficient ground for sustaining the motion to quash.

II. That as to the Act of Assembly under which the Orphans' Court preferred these charges, this Court deems it to be its duty to resolve any doubt respecting the constitutionality of the Act in its favor, and if the Act is susceptible of two constructions, one of

which would make the Act unconstitutional and one constitutional, to adopt that which will sustain the Act. That in our judgment the Act does not imperatively require this Court to lay the rule.

III. That the necessity *vel non* of an affidavit is a matter resting in the discretion of this Court, and the charges in this case emanating from an official body, created by the Constitution, and being authenticated by the seal of the Court, do not require any verification by affidavit.

IV. That having fully answered the charges these respondents must be taken to have waived any objection thereto upon the ground of uncertainty.

The motion to quash is therefore overruled.

Before going into the particulars of the testimony given at the trial, it may be proper to state in brief outline what we find to be the general nature of the case we are to deal with.

An intestate estate of over $12,000 was in process of settlement in the Orphans' Court. An administrator had been appointed and had given bond. The person to whom letters had been granted was neither a relative nor a creditor, but the coroner who had taken charge of the remains. In the condition of the law as then understood by a majority of the Orphans' Court, these letters were liable to be revoked upon application of a non-resident brother. Although the law has since been determined otherwise (Jones vs. Harbaugh, supra), yet viewing the case as it then appeared, there was a promising opportunity here for litigation. From such litigation might ensue profitable results to any attorney who should be so fortunate as to represent this non-resident brother. There would be fees for a contest over the administration. There would be commissions on the collections of his distributive share.

With this exception there were no complications of any kind attending the settlement. There were no doubtful assets to be collected, no doubtful claims to be contested. In fact there were no claims at all, either for or against the estate. There was a bare possibility of a will turning up. There was a bare possibility of creditors turning up. Should either contingency happen, the duty would devolve upon the administrator to meet that contingency as he might be advised.

There were no conflicting claimants to the distribution. There was but one distributee, a brother, living in Illinois. Of his existence and general whereabouts the administrator was aware. His counsel had already made arrangements to go to Illinois in quest of him, when he found himself anticipated by the voluntary intervention of Messrs. Quinn and Winternitz.

The single question as to the regularity of the letters excepted, there was no litigation in sight, either actual or prospective; no disputed questions of fact or law; no negotiations required, and no special circumstances of doubt or difficulty to embarrass the settlement. The estate was one that could and should have been settled in the ordinary way, as a mere matter of routine, and with no more than ordinary expense. What made the settlement especially simple was the fact that, besides two pieces of leasehold property appraised at $1,200, and furniture appraised at $76, the residue of the estate was cash; cash in the house $727, cash in bank, $10,660.97, total cash $11,387.97. Total inventory, $12,663.97.

Notwithstanding the point above mentioned as to the regularity of the letters, this estate was so absolutely free from difficulty that we find a premature settlement of the great bulk of it effected within less than two weeks from their date, the administrator, for a consideration, willingly assuming all risks, and that with the consent of his surety, the American Bonding Company.

The result of this settlement of $11,387.97 cash is that the sole distributee receives but $4,050, while the balance, $7,337.97, is absorbed in fees, costs and expenses, there being no debts; Messrs. Quinn and Winternitz claiming and retaining $5,150, under a written contract for compensation. Of this $5,150, the sum of $4,350 was claimed as their contract fee; the sum of $300 for their expenses in securing the distributee by an expedition to Illinois, of which more will be said further on, and the sum of $500 was retained to secure their claim upon the undistributed balance of the estate, appraised at $1,276.

Whether, and to what extent Messrs. Quinn and Winternitz either or both, are culpably responsible for this repulsively, discreditable showing, is the painful question we have now to decide.

And first and chiefly we have to consider the means and management by which they connected themselves with the case, and secured from Harbaugh, the Illinois brother and sole distributee, first a power of attorney, and upon that, the contract above mentioned.

It appears that the deceased, Charles L. Harbaugh, was a drinking man, and frequented a place in Baltimore kept by one of Mr. Quinn's clients, named Jubb. Jubb, in some way not explained, became possessed of three letters addressed to the deceased, and these letters he turned over to Mr. Quinn, together with the information that the man was dead, that he left two houses, and possibly some other property, that he had a brother living in Illinois, that these letters might help to trace him, and that there might be something in it for Quinn.

Mr. Quinn handed these letters to his partner, they talked the matter over, and the result was that, aided by the information contained in these letters, written by the brother in Illinois, they found little difficulty in getting into telegraphic communication with the writer, and afterwards talked with him over the long-distance telephone.

The impression made upon the mind of the live Harbaugh, from this communication over the wires, evidently and naturally was that his Baltimore correspondents had some legitimate, professional connection with his deceased brother's estate. First, he was startled by the dispatch "communicate with us by wire immediately. Important business. (Signed) Quinn & Winternitz." Then came the message "Call us up over the long-distance telephone, Central Office, right away. We will pay expenses. (Signed) Quinn & Winternitz." Then followed a somewhat unsatisfactory telephone talk, clear enough, however, to convey to Harbaugh the first information of his brother's death, and to leave upon his mind, the distinct impression that the voice at the Baltimore end of the line was authorized to speak in behalf of his brother's estate. In fact, he positively swears that in reply to his question: "Who has charge of his affairs?"

the voice answered, "I have." The use of this language is denied by Quinn, the man behind the voice, but he admits having some talk with Harbaugh, the substance of which is not given, and he does not claim to have explained to Harbaugh the character of his interest in the matter, or how he became connected with it, nor does he mention the letters obtained from Jubb, nor say a word to disabuse Harbaugh's mind of the natural impression that Quinn must have known and felt, would have been made upon it by all this knowledge of and interest in his brother's affairs, and the offer to "pay expenses."

In point of fact Quinn had never known the Baltimore Harbaugh, and the first he ever heard of him was when he heard from Jubb of his death. Whether or not he expressly claimed through the telephone, as understood at the Springfield end of the line, that he had charge of the estate, there can be no doubt from all that passed, from what was said and from what was not said, that such was the distinct understanding of the Illinois Harbaugh, and that Mr. Quinn was willing to have it so.

If it were possible to entertain a doubt upon this point, the doubt will vanish when we come to follow Mr. Winternitz to Springfield, Illinois, and see how thoroughly prepared he found the live Harbaugh to give him his entire confidence at sight, for here it must be noted that Harbaugh had in some way fallen into the mistake of supposing that it was not Quinn but Winternitz who had been talking to him over the telephone.

Before using the telephone a visit had been made to the Orphans' Court by Mr. Winternitz. From the bond of the administrator—$3,000—and from what he learned from the appraiser, McGraw, he says that he concluded that the value of the estate was not more than $1,500. McGraw, the appraiser, was a personal friend of Winternitz, and said that he had met the Illinois Harbaugh many years before in Baltimore. Winternitz proposed to McGraw that he go with him to Springfield, Illinois, to identify Harbaugh. McGraw was willing to go for fifty dollars and his expenses, and it was so arranged.

Winternitz and McGraw both swear positively that when they left Balti-

more for Springfield, Illinois, at 7 o'clock in the evening of Monday, July 9, 1900, they knew nothing more of the value of the estate than the records of the Orphans' Court at that time disclosed, and perhaps a few hundred dollars in money, and the testimony of Mr. Quinn is to the same effect. Considering the lively interest manifested and the eager activity and alertness displayed by the partners at the time, it remains the phenomenal mystery of this case that neither one of them, nor McGraw at the Orphans' Court, should have heard all that long summer day, to say nothing of the day before, which happened to fall on Sunday, not so much as a rumor that on the Saturday evening previous the money and bank books representing over $11,000 had been secured by the police and were in the custody of the police department. It is certainly quite uncommon to behold so much dashing enterprise coupled with so much inert ignorance. The ignorance claimed here was of a highly important, and decidedly interesting, if not exciting discovery, and the information was quite easily accessible. Had Mr. Winternitz at any time on that Monday, before his departure in the evening for Illinois, taken the ordinary precaution of communicating with the administrator, he would have learned that the money and bank books, representing over $11,000, had been obtained by the police, and that the property was then practically in the administrator's possession. (Jones vs. Harbaugh, supra.)

We make these observations in passing because they lie directly in the way. While these circumstances, in connection with the very peculiar and unusual terms of the contract for fees afterwards obtained from Harbaugh, are calculated to arouse a violent suspicion, we do not feel warranted in the face of the strenuous and repeated denials of all three of the parties, and in the absence of any direct testimony, to rely upon them as proof of a black and wicked fraud. The means of deception resorted to were of a more refined and subtle character, as we shall soon have occasion to point out.

Mr. Winternitz first came into contact with Mr. Harbaugh at Springfield, Illinois, on Wednesday, July 11, 1900, the same day on which the inventory was filed by the administrator, in the Orphans' Court of Baltimore. Winternitz had with him appraiser McGraw: he had the three letters obtained from Jubb and he had a ready made power of attorney for Harbaugh to execute in the following terms:

"Know all men by these presents— That I, Edward McC. Harbaugh, of the State of Illinois, and County of Sagnamon, do hereby constitute, nominate and appoint Augustin J. Quinn, Charles Winternitz, of the firm of Quinn and Winternitz, or either of them, of the City of Baltimore, and State of Maryland, to be my truly sufficient and lawful attorneys for me, and in my name and stead to take charge of the estate of my late brother, Charles. Leonard W. Harbaugh, and direct them to be appointed administrators for him, the said Charles Leonard W. Harbaugh; and for me and in my name and stead to execute and acknowledge, according to law, any and all agreements, releases and papers which *may* be necessary, or which may be required by law for the purposes of this power of attorney, and if any one else has been appointed administrator for my said deceased brother, I direct the said Charles Winternitz and Augustin J. Quinn to file a petition in the Orphans' Court to have said letters revoked and in case the Court refuses to appoint the said Charles Winternitz and Augustin J. Quinn, administrators as aforesaid, then I direct whoever the administrator may be to pay over to my said attorneys whatever monies I am entitled to out of the estate of my said brother, and generally do all lawful acts and things whatsoever concerning the premises as fully and in every respect as I might or could do were I personally present at the doing thereof, hereby ratifying and confirming whatsoever my said attorneys shall in my name, place or stead lawfully do or cause to be done in or about the premises by virtue of these presents.

As witness my hand and seal this 11th day of July, 1900.

EDWARD McC. HARBAUGH, (Seal).

In presence of—

JOHN THOMPSON,
CHAS. C. NICCOLLS.

Subscribed and sworn to before me this 11th day of July, 1900.

JOSEPH S. THOMPSON,
Notary Public,
221 S. 5th St., Springfield, Ill."

No difficulty whatever was found in obtaining Harbaugh's signature. He had been advised of the visit by telegram, and from the moment of the meeting he appears to have acted as if he believed that he was in the hands of his friends.

Harbaugh is not a business man, in the sense in which that term is commonly understood. He was not accustomed to important negotiations, not familiar with the settlement of estates, and not experienced in coping with lawyers. A middle aged man, of certainly not more than the average intelligence belonging to his station in life, that of a laborer at "$1.50 a day, for twelve hours' work." He appears to have been also a farmer, and employed as a foreman in a brick yard. He was entirely ignorant of the facts, as well as the law applicable to the emergency with which he was now confronted, the most important business of his life. His relations with his deceased brother were such that he knew nothing of his property, except as he was informed by the visitors, who had kindly troubled themselves to look him up. He did not even know of his brother's death. We have had him before us as a witness, and have heard him examined and cross-examined. He impressed us as a rather slow and simple minded man, without guile himself, and not inclined to suspect guile in others. He seems indeed to be a credulous man, a man who will sign and even swear to almost anything presented to him by persons in whom he happens for the moment to have confidence. Notwithstanding that circumstance, and the adroit use made of it in cross-examination, he impressed us, upon the whole, as a fairly credible witness, and as a well-meaning, honest and simple rustic.

By this sweeping legal instrument he put himself unreservedly in the power of two entire strangers, apparently without a moment's hesitation, and without taking any of those precautions which would have occurred as indispensable to any man of ordinary business experience. He asked for no references as to the character and professional standing of the unknown attorneys who were now making such large claims upon his confidence. He made no inquiries as to the fees he would be expected to pay. It did not occur to him to take the paper to some local attorney for advice. He asked for no time for consultation with friends.

Winternitz testifies that after telling Harbaugh what he knew about the estate—two houses and possibly two or three hundred dollars in cash—the administrator's bond for $3,000—indicating an estate of about $1,500, or at most about $2,000. "The first thing I said to him was, I brought with me a power of attorney and I would like to have you execute it, sign it and swear to it."

Learned counsel for respondents at this point propound without objection a leading question to elicit from the witness his confirmation of a legal opinion of his counsel:

"That was a power of attorney, in fact, you mean?"

"Yes, sir; so I had a typewritten power of attorney with me, and I read the power of attorney to him, and he read it himself, and he executed it in the Leland Hotel."

"Did you tell him why you wanted that power of attorney signed at that time?"

"Yes, sir; I told him we better have a power of attorney so I could send it at once to Mr. Quinn, so that he could attend to that end of it in Baltimore."

To any man of common sense not under the influence of some delusion, thus approached by a stranger with a request to sign himself away, the explanation thus given would be instantly rejected as unsatisfactory, or rather as no explanation at all.

Something like an explanation is supplied by Harbaugh, who testifies that Winternitz told him that there appeared to be "several of my cousins or claiming to be cousins, that are making efforts in order to try to get hold of the estate." * * * "We want a power of attorney in order to fight those claims, that Mr. Quinn is back there at Baltimore, and we will just send a power of attorney back to him, so they produced a typewritten copy of a power of attorney which I signed: then they asked me if I knew where there was a Notary Public," etc.

Whichever of these versions be the true one, the conduct of Harbaugh in so readily placing himself in the power of the unknown attorneys in a distant city, would seem strangely infatuated

unless that conduct is understood in the light of the delusive appearances craftily held out to entrap him. From the moment of his first personal contact with Harbaugh, Mr. Winternitz could not possibly have failed to notice that, as the result of the previous communications over the wires Harbaugh was under the erroneous impression that he, Mr. Winternitz, was in some authorized manner, properly and duly connected with the settlement of his brother's estate. Not a word was said to correct this perfectly apparent mistake. Harbaugh was not informed of the truth, which it was very important for him at that particular time to know, that the relation of Quinn and Winternitz to the case was purely casual and altogether voluntary. Had he known that, and acted like a man of common sense, he would have inquired for their references, or taken the advice of local counsel in whom he could confide, or he would have declined to have anything to do with them.

There was not only this want of candor on the part of Winternitz, in concealing the true character of his approach to Harbaugh, and in taking advantage of the false impression made upon him in advance, in the manner already stated, but there was a cunning agency of affirmative deception actually present well calculated to prevent suspicion and allay misgiving, if any such should by any possibility awaken in the slow mind of the subject of the artifice.

It has been already stated that Edmund J. McGraw, an appraiser of the Orphans' Court, was employed and paid by Winternitz to accompany him to Illinois. As Winternitz would have it, and as McGraw would have it, he was there simply to identify Harbaugh, nothing else. He did identify him, although he was not recognized as an old acquaintance by the man identified. Harbaugh was not told that McGraw was brought on, at the expense of Winternitz, primarily, but with the intent of its being, ultimately, at his, Harbaugh's expense, simply for the purpose of identifying him. He was told that McGraw was an appraiser of the Orphans' Court, and that he had made the appraisement of his brother's estate.

It was natural for a man as unfamiliar with this sort of business as

Harbaugh was to infer, from the appearances artfully spread before him, in the absence of any word of caution, that McGraw was there in his official capacity, with the sanction or by the authority of the Orphans' Court. Harbaugh indeed swears positively that McGraw expressly told him that he "represented" the Orphans' Court of Baltimore. McGraw emphatically denied that he used that language; "It is a falsehood, I never made the statement to him at all. I told him I was an appraiser of the Orphans' Court." Mr. McGraw then goes on; rather by way of comment than testimony: "I was not there representing the Orphans' Court, or anything of that kind; it would have been foolish for me to say any such thing; it would be absolutely impossible for any man to represent the Orphans' Court, unless it were a judge, I should imagine."

That is what McGraw now argues to this Court, but no suggestion or hint of the nature was made to Harbaugh at the time. He was not told that the mere casual circumstance of McGraw's happening to be an appraiser had nothing whatever to do with his presence on the scene, and that all he was there for was simply to identify Harbaugh, just as any unofficial person who happened to know him might have served the same purpose.

Whether or not McGraw claimed in so many words to be there "representing" the Orphans' Court, there can be no doubt that such was the distinct impression made upon Harbaugh at the time; that both McGraw and Winternitz were willing to have it so, and that nothing was done or said by either of them to remove that impression.

Harbaugh could not be supposed to have known that McGraw in thus leaving his desk to accompany an attorney on a distant hunt for Orphans' Court business was guilty of official misconduct that made him liable to removal from office.

Nor could he be supposed to have known the exact scope of an appraiser's duties and powers under the law and practice of Maryland. For aught he knew to the contrary, it was a lawful and customary thing for appraisers to act just as this appraiser was then acting. For anything he knew or was told to the contrary, McGraw was there acting in his official capacity, and it

was therefore very natural for him to conclude, in the absence of any word to put him upon his guard, that this appraiser of the Baltimore Orphans' Court was there by its authority, countenancing and approving the mission of Winternitz, and commending him to Harbaugh's confidence, as the proper person to be entrusted with Harbaugh's interest in his brother's estate, then being settled in the Orphans' Court, of which McGraw was the appraiser. Care was taken to make this impression upon the unsuspecting countryman, at a very early stage of the interview, and before coming to business.

"I think," testifies McGraw, "after we left the horses at the stable as we were coming from the stable to the hotel, Mr. Winternitz told him that the estate amounted to about $1,500, as the bond was filed for $3,000. I think Mr. Winternitz then told him I was an appraiser of the Orphans' Court. I told him I was and had appraised his brother's estate, and I had appraised two houses and $76 worth of furniture, and I then told him, at the same time, while I was appraising the property and furniture a gentleman came to the house and tried to get in, and myself and the coroner were the only two in the house, and I afterwards found out his name was Heming. He told me that Harbaugh along in February had had a city bond or stock and had sold it and was drinking the money up very rapidly. He had seen him with some gold, or something of that sort. I think I told Mr. Harbaugh at the same time that no money was found in the house at all, and the only thing returned was $76, and the leasehold pieces of property."

Since McGraw was there in proper person; since he was there apparently for the purpose of giving Harbaugh this detailed information, since Harbaugh was not told that McGraw was there for any other purpose, it was perfectly natural for Harbaugh, being the sort of man that he was, to conclude that McGraw was there in his official character of appraiser, and therefore in some way, of course not very clearly defined, "representing" the Court of which he was the trusted and authorized officer.

Harbaugh was deceived and Winternitz profited by the deception, in gaining an additional fictitious claim upon Harbaugh's confidence, thus derived from the presence and countenance of an official personage, responsibly connected with the very Court to which Harbaugh naturally looked with respect, if not with reverence, as the Court having jurisdiction and control of his brother's estate.

For this deception Winternitz is responsible, by introducing McGraw an appraiser of the Orphans' Court, while concealing McGraw's true relation to the business, and suppressing the fact, if indeed it was a fact, that McGraw was there simply in his private and individual capacity, for the mere casual purpose of personal identification, and nothing more.

We now come to the misleading and deceitful use made of the letters obtained in Jubb's saloon, in which Harbaugh at once recognized his own handwriting. The exhibition of these letters does not appear to have been necessary to inspire the confidence required for the execution of the power of attorney. For that object the previous correspondence and the co-operation of the appraiser abundantly sufficed. But no arrangement had yet been made of the somewhat ticklish question of fees. Later in the day Harbaugh was to be approached on that subject with an exacting demand. On thinking the matter over, or possibly on talking it over with friends, Harbaugh might begin to have some misgivings.

However that may be, that fact is, that before the time came for the adjustment of compensation, the letters were produced. As already noticed in passing, there happens to be no mention of these letters in the answers of the respondents. In his examination in chief, Mr. Winternitz made no reference to them. But on his cross-examination by Mr. Bonaparte there occurs some testimony so remarkable that it will be quoted at length:

Q. When you went to Springfield had you any letters in your possession written, or professing to have been written, by Mr. Harbaugh?

A. Yes, sir, I had three letters.

Q. From whom had you received those letters?

A. From Mr. Quinn.

Q. Were those letters in your possession or in Mr. McGraw's, if you remember?

A. They were in my possession.

Q. Were they shown to Mr. Harbaugh at any time, or any of them?

A. Yes, sir.

Q. When?

A. When we were in Springfield.

Q. Can you remember in what part of the day?

A. No, I cannot say I remember.

Q. Do you remember how they came to be shown to him?

A. I think one of the letters was in reference to the death of his mother; that after his mother had died he had written this letter to his brother, and I think I showed him the letter.

Q. Did you explain to Mr. Harbaugh how the letters came into the possession of the firm of Quinn & Winternitz?

A. I don't think I did, because I really didn't know. When I was out west I did not know where Mr. Quinn had gotten the letters from.

Q. Did you tell him they had been given to you by Mr. Quinn?

A. I think I did; yes, sir.

Q. Did you tell him where Mr. Quinn had gotten them?

A. No, if my recollection serves me correctly I think I told him I was of the impression Mr. Quinn had done some work for his brother, but I did not say anything about his being a personal friend of Mr. Quinn's; that was my impression.

Q. Were you under the impression Mr. Quinn had done some work, you mean professional work?

A. Yes, sir.

Q. For his brother; you told Mr. Harbaugh that?

A. Yes, sir; I think that is what I told him.

On carefully comparing this testimony with that of Mr. Quinn, it will be found that when Winternitz swore that he really didn't know where Quinn had gotten the letters from, he swore to something not only highly improbable but absolutely incredible. These two lawyers had only been in business together a few weeks, and the capture of these letters, under all the circumstances, was no mere incident of the office routine, but an altogether exceptional and decidedly interesting, if not romantic adventure. Quinn very distinctly testifies that the morning after his visit to Jubb's place he called his partner's attention to his "errand of the afternoon before," and that on the strength of their talk over the matter (the matter being the errand to Jubb's and the letters there obtained) they began to use the telegraph. We regret that we find it impossible to believe Winternitz, when he claims ignorance as to the means by which those important letters came into his partner's hands. He felt himself pressed by the cross-examination into the position of concealing from Harbaugh the true account of the connection of his firm with the estate, and in the effort to extricate himself from that dilemma, he does not scruple to resort to a bold and unblushing denial of the leading fact in the history of this case.

He then testifies that he told Harbaugh that Quinn had done professional work for his brother. Mr. Winternitz must have known when he made that representation to Harbaugh that it was absolutely untrue. Quinn himself testifies that the first he ever heard of the man was when he heard from Jubb of his death. It is not at all likely that Quinn at any time deceived his partner by falsely pretending to him to have even known the deceased Harbaugh, much less by pretending to have served him professionally. We learn from Quinn's testimony that his errand to Jubb's place on Friday evening was a subject of consultation between the partners on Saturday morning, and in that consultation Winternitz was naturally advised by his partner of the facts learned from that errand, the main fact being the information derived from Jubb that a man named Harbaugh, whom Quinn did not know, was dead leaving some property and a brother out west, and three letters which Jubb passed over to Quinn as means that would be useful in tracing the brother. When Winternitz told Harbaugh that Quinn had done professional work for his brother, he made a false representation, which could have had no other design than to account for the possession by Quinn of his brother's letters, and to confirm the erroneous impression made, as has been seen, on Harbaugh's mind by telegraphic messages, by speech through telephone and by the presence of an appraiser, that his Baltimore correspondents were in some legitimate manner connected with the

business of his brother's estate. And when in order to conceal from Harbaugh the real origin of their connection with the case, he failed to inform Harbaugh, when the Jubb letters were exhibited, of the real means by which those letters had been secured, he suppressed a material fact which, as has already been suggested, it was of vital importance at that time to Harbaugh to know, in order to be enabled to form some intelligent estimate of the strangers with whom he was dealing, and of the worth of their claims upon his implicit confidence. Of this Winternitz was fully aware, and appreciating upon his cross-examination the damaging effect of this concealment, makes an impulsive effort to escape by rashly claiming ignorance of the initial fact from which this whole business has grown, the fact that Quinn got those letters from Jubb.

Mr. Winternitz has not only been uncandid with Harbaugh, but we regret to be compelled to find that he has been something worse than uncandid with the Court, to an extent which cannot but materially impair the general trustworthiness of his testimony.

There is some discrepancy in the testimony as to whether the letters were produced by Winternitz or by McGraw. Harbaugh says they were produced by the latter; Winternitz, as has been seen, that they were exhibited by himself. According to Harbaugh's version, as soon as he recognized his own handwriting, McGraw told him "that Mr. Augustin Quinn is a personal friend of your brother's, and some two months before your brother's death he gave him those letters, telling him that if anything happened to him he would know where to locate you." McGraw denies that he told Harbaugh that Quinn was a personal friend of his brother's, but it is noticeable that he does not deny, and is not asked to deny telling him that his brother before his death had given Quinn the letters. Winternitz swears as already seen to telling Harbaugh the fable that his brother was one of Mr. Quinn's clients, and in that way leaves Harbaugh naturally to infer for himself that it must have been as the result of that professional connection that his partner had obtained those letters, Winternitz at the same time boldly claiming ignorance of the fact that his partner got the letters from his client Jubb.

Whatever may be the exact reconcilement of these discrepancies, the fact remains that the truth as to the obtaining of those letters was suppressed, the agency of Jubb concealed, and false representations were made to Harbaugh, craftily designed to entrap his confidence by securing his faith in the fiction that the Jubb letters were important testimonials of his deceased brother's confidence in the Baltimore attorneys, and therefore evidences of the legitimate and authorized connection with the settlement of his estate.

Shortly after the exhibition of the letters the parties separated with the understanding that Harbaugh should accompany Winternitz and McGraw on their return to Baltimore that night.

Between nine and ten o'clock that night the parties again met, and the following contract was drawn by Winternitz and signed by Harbaugh:

"Leland Hotel,

Noble B. Wiggins,

Proprietor.

Springfield, July 11, 1900.

I hereby agree to pay Augustin J. Quinn and Charles Winternitz, trading as Quinn and Winternitz, for professional services rendered and to be rendered and for locating me, fifteen per cent. of the proceeds realized from two pieces of leasehold property in the City of Baltimore which belonged to my deceased brother, Charles Leonard W. Harbaugh, who died intestate or testate and of which I am heir. And in addition I agree to pay them one-half of whatever money, stocks, bonds, or other property my said brother may have left and of which I am entitled to according to law. Provided the said money, stocks, bonds and other property amounts to at least five hundred dollars, and in case it does not amount to that much then they are only to receive fifteen per cent, of what is coming to me, including expenses for making the trip to Illinois, and whatever sum or sums they may expend in my behalf for railroad fare, board and money advanced me whilst in Baltimore, Maryland. And I direct the administrator or executor of my deceased brother, whoever he or they may be, to pay to the said Quinn and Winternitz the amounts and percentage above specified when distribution is made.

156

Witness my hand and seal this 11th day of July, 1900.

 Edward McC. Harbaugh (Seal)."

Witnessed by George H. Buck.

As to the negotiations that led up to the execution of this remarkable paper there is hopeless conflict of testimony. Winternitz would have us believe the improbable story that its very singular terms were imposed upon him by Harbaugh, and were reluctantly consented to by Winternitz as a great concession from his first demand of one-half the entire estate. We have already had occasion to see how far the statements of this gentleman are entitled to implicit confidence.

Harbaugh, with more probability, testifies that the suggestion came from McGraw, and was acquiesced in by himself. If Harbaugh was intending to deceive, there seems no reason why he should have put this suggestion upon McGraw rather than directly upon Winternitz.

To show the shuffling and evasive manner in which Mr. McGraw undertakes to contradict Harbaugh on this point would overload this opinion with a page and a half of rambling and vague irrelevancies, and would be an idle waste of time and space.

We have by this time penetrated far enough into the inwardness of this case to find that the very presence of McGraw upon the scene as he showed himself to Harbaugh in his official character of appraiser of the Baltimore Orphans' Court, was one of a series of shams, and that the whole attitude of McGraw towards Harbaugh at Springfield is stamped with insincerity.

It is not at all necessary to canvass in detail this mass of conflicting, and much of it suspicious testimony, since we have the written paper, which speaks for itself, and in connection with it we have decisive facts, established beyond the reach of successful controversy.

This instrument on its face purports to be an agreement for compensation "for professional services rendered and to be rendered and for locating me." As the paper itself refers to the professional relation as already established, the transaction was one between attorney and client, and was made subject to the principles which govern that relation. Any abuse of confidence or unfair advantage taken by the attorney would present a case of constructive fraud. We do not find it necessary to dwell on this point, which will be found superseded by the larger question of actual fraud.

Looking outside the paper we have the fundamental fact that the basis alike of the negotiations and the contract was the representation made to Harbaugh of the approximate amount of the estate, since it was upon this amount that the rate of compensation was measured.

This amount was a variable quantity, it is true, but variable only within certain fixed and narrow limits. The amount of the administration bond, $3,000, was repeatedly referred to both by Winternitz and McGraw, as fixing those limits. The largest sum named by either of them as a possible maximum was $2,500.

Upon his cross-examination Harbaugh testifies as follows: "When I made the contract with Winternitz I understood it to be upon the basis of the estate not to exceed $2,000 or $2,500, and afterwards it turned out to be more than that. I would never have made the contract that way if I had knowed it was more than that."

There is nothing to contradict this in the testimony, and it is sustained by all the probabilities of the case. Mr. Winternitz, himself, in his account of the bargaining, quotes Harbaugh as telling him, Winternitz, at that time, just before the signing of the paper, "that the estate only consisted of the two houses and some personal property amounting to some $1,500." Notwithstanding the vague possibility before that time suggested of the estate being increased to $2,000 or $2,500, the suggestion does not appear to have been made in any such way as to impress Harbaugh with the idea that the estate was at all likely to exceed $1,500.

Not a hint or suggestion is made to Harbaugh at any time of the possible discovery of any such sum as $11,000, or any substantial fraction of it. There could have been no such suggestion since Winternitz expressly says that when he left Baltimore he had no reason to even suspect that the estate at that time amounted to as much as $3,000.

If Winternitz had no such idea in his own mind, it is certain that he

could have imparted no such idea to Harbaugh, and the wildly extravagant suggestion which Winternitz now says he threw out during the course of the bargaining—"As far as I know, your brother might have left $100,000"— can not be seriously claimed as having had the effect of removing, or even of impairing, the fixed impression of the limited amount of the estate which had been made in Harbaugh's mind by the repeated assurances of Winternitz, and confirmed by the detailed statements of appraiser McGraw, which came to Harbaugh, as has been seen, with all the apparent weight of official authority.

Upon all the evidence, we have no difficulty whatever in finding, as matter of fact, that the parties to this contract dealt with each other upon the clear understanding of an estate varying in amount between $1,276, the amount of appraisement and $3,000, the maximum limit fixed by the penalty of the administration bond. The rate of compensation being measured upon this basis, the amount of the estate was the one fundamental fact essential to the contract. If the real amount of the estate should afterwards be discovered to vary materially from this basis, it would be disclosed that the contract had been made under a mistake of fact, and the mistake being fundamental, that is to say, a mistake in matter of substance, and not in matter of form or expression, the party injured by the mistake would be in a position to claim the cancellation or rescission of the contract, upon equitable terms.

Leaving the question of mistake, we are now reluctantly compelled to consider the graver question of fraud.

We pass by as comparatively unimportant the gratuitous suggestions of imaginary dangers artfully held out by Mr. Winternitz during the negotiations, to excite Harbaugh's fears, and belittle his interest, culminating in the threat "probably you won't get a cent" and will briefly refer to the more serious circumstances which indicate, in the case of the contract, as in the case already considered of the power of attorney, actual deceit and imposition.

For it is quite apparent that when Harbaugh's signature was obtained to this contract, he was still under the same delusion as that which has been seen influencing him to sign the power of attorney. Nothing whatever had been said in the meantime to correct that impression. Instead of that an additional circumstance of deception had been artfully introduced to confirm it. The misleading tenor of the preliminary correspondence, and the misleading presence of the appraiser, had been re-inforced by the misleading exhibition of the Jubb letters. By the time his signature was asked to the contract, Harbaugh had been made to believe the fiction that Quinn had been counsel for his deceased brother, that Quinn and Winternitz were legitimately connected with the settlement of his estate, and that Winternitz was there with the approbation of the Orphans' Court of Baltimore City, as testified by the official presence of their duly authorized appraiser.

It will thus be seen that the question here is not merely a question of constructive fraud. This is not a transaction between a legitimately retained solicitor and his client, where the question is of an unfair advantage taken of the legitimate relation. This is the case of a mere interloper, a pragmatical intruder, artfully concealing his real character by disguises and tricks of various kinds, and successfully imposing himself upon an intended dupe behind the mask of simulated authority. In that assumed and fictitious character he succeeds first in obtaining the power of attorney. By the same fraudulent means, aggravated by another deceptive artifice, accompanied by a downright misrepresentation, he finally obtains the contract. Had Winternitz told the truth, he would have obtained neither.

It thus appears quite plain that the question of dealing "at arms length" of which much is said in the answers of the respondents, as well as in argument, is here superseded by a question of common honesty, as between man and man. As already seen this is not a question of a solicitor taking an undue advantage of a client's confidence, after having secured that confidence by worthy means. It is simply a question of a tricky, outside attorney, fraudulently capturing a client and ensnaring his confidence by false pretences. The question plainly is not of constructive, but of actual fraud.

Shortly after the execution of the contract Messrs. Winternitz and Mc-

Graw returned to Baltimore, bringing Harbaugh with them. Here, matters were so expeditiously arranged that on 17th July, a "quick settlement" of the $11,387.97 was effected, Harbaugh executing a release to the administrator for that amount, and receiving in full of his distributive share therefor the sum of $4,050, while Messrs. Quinn and Winternitz, under the aforesaid contract, claimed and retained the sum of $5,150, as already mentioned.

The proposition for this "quick settlement" came from Mr. Winternitz. He had first intimated to the administrator a wish to be associated, either himself or his partner, in the administration. This Dr. Jones declined, but indicated his willingness to "step down and out." Winternitz then said they did not want that, "they wanted a quick settlement of the estate." Reference was then made by counsel for the administrator to the risk that would be assumed by a premature settlement, and negotiations followed, as to the terms upon which the administrator would consent to assume that risk. The terms proposed by Dr. Jones were finally accepted. He was to receive $1,000, and his counsel was to have a fee of $500. Upon filing his inventory the administrator had given an additional bond in the sum of $22,000. The consent of his surety, the American Bonding Company, to the arrangement was obtained without difficulty, and the settlement was made.

Mr. Winternitz did not inform his client of the administrator's willingness to "step down and out," but on the contrary made Harbaugh believe that there would have to be a "fight" to get him out, and that Harbaugh would have to stay in Baltimore an indefinite time until the result was determined. This fear so worked upon Harbaugh's mind, in connection with the condition of his family and his business at home, that his acquiescence in the "quick settlement" and the additional expense it involved, was obtained with little difficulty.

While this negotiation was pending, according to Harbaugh's testimony, Mr. Winternitz spoke to him about the likelihood of a will turning up, and asked if he would be willing to take $3,500 for his share of the estate, to which Harbaugh says he replied, "If there is a will, let it turn up." Winternitz does not have his attention called to this piece of testimony upon his examination in chief, and upon cross-examination he does not deny it, but says he merely "threw it out as a suggestion."

All the details of the settlement were managed by Mr. Winternitz, Mr. Quinn taking no active part. Some of these incidents may be passed over, as unimportant in the present connection. When the actual distribution came to be made, it was found that $9,200 was the amount payable to Quinn and Winternitz, as attorneys for Harbaugh. Winternitz requested the amount to be divided into two checks, and he was accordingly handed one check for $8,700 and one for $500. His client knew of the $8,700 check, but was not informed of the other. The explanation given by Mr. Winternitz is, that he retained that $500 check to secure the interest of Quinn and Winternitz in the unsettled residuum of the estate, viz: the leasehold property, but no such explanation was given to his client, who received no written or unwritten acknowledgment that there was anything further to come to him out of that part of his brother's estate for which he had executed a release.

While an attorney is bound at all times to be perfectly truthful and candid, especially towards his client, there is no occasion upon which such candor is more especially necessary than when he reaches the final and important stage of the business in paying the client the money that belongs to him, or in accounting for its retention.

In addition to the $500 thus retained and not accounted for to the client, Quinn and Winternitz claim and retain under the contract one-half his distributive share amounting to $4,350, and in addition $300 for the expense of the Illinois trip, including the expense of keeping Harbaugh in Baltimore.

It will be found upon examination that the actual professional work done amounts to about this: the drawing of a power of attorney, and its execution before a notary; the drawing of a contract for fees; a negotiation with the administrator resulting in a "quick settlement;" certain uncontested proceedings incidental to the settlement, and lastly, the handling of the money.

Even if this work had been done in the interest of Harbaugh and for his

benefit, it was conspicuously insignificant when compared with the enormous compensation received. But all this work was done in the interest and for the benefit of the attorneys, and was hostile to the interest of the client. The "quick settlement" was manifestly for their interest, since it put them at once into possession of the money, before the client could discover the fraud that had been practiced upon him. For the same reason the "quick settlement" was hostile to ' the client, and also because of the unnecessary expense which would have been avoided by simply awaiting the statutory period.

It was through no diligence or effort of the attorneys that the money was discovered. On the contrary, the discovery had been made for several days before, as they claim, they knew anything about it.

Neither was it to them that Harbaugh was indebted for his own discovery. Had the Jubb letters never been found, and had these attorneys never heard of the case, Harbaugh would have been traced by the administrator, who already had the necessary information.

For services such as those described we find these attorneys claiming and retaining an amount that would be deemed a liberal compensation to leaders of the bar who had secured a precarious claim by the exercise of the highest professional skill and learning, through a long course of arduous and doubtful litigation.

Sooner or later Harbaugh must have discovered that he had been duped and victimized. Some days after his return he wrote a complaining letter, and on the 2nd of August an indignant reply was sent by Winternitz, in the name of the firm, which concludes as follows:

"As far as our contract is concerned we do not intend to deviate from it one iota. You are old enough to know that when you sign an agreement you are expected to live up to it. The object in getting you to sign such a contract was for the purpose of holding you of which we intend to do. All we want to know from you is whether you desire to repudiate your contract, for if you do, we will then know what steps to take to compel you to abide by its terms. You are at liberty to make any investigation you desire, as we have nothing to fear, for what we did was strictly according to agreement."

Shortly after came Harbaugh's petition against Quinn and Winternitz and others in the Orphans' Court, with the result already stated, including the institution of the present proceeding, upon charges preferred by the Orphans' Court.

Every attorney before admission to practice, pledges himself by solemn oath or affirmation to demean himself at all times "fairly and honorably as an attorney and practitioner at law."

Md. Code, Art. 10, Sec. 10.

Upon taking this oath, an attorney becomes an officer of the court, and is invested with high privileges and responsibilities, which distinguish the profession of law from all other pursuits. He is accredited to the public as in every way worthy of confidence, and the subjects of that confidence are lives, liberties, reputations and fortunes. He is entrusted with individual and family secrets. He is allowed freedom of access to all court records and papers. He is appointed to fiduciary positions, and hand'es other people's money. As an advocate he is privileged with almost unbounded liberty of speech and license of questioning. There are frequent occasions for suggestions or representations of fact to the court, and it would be intolerable if courts should find themselves surrounded by lawyers whose personal assurances could not be trusted. The law is a profession of great opportunities and great temptations.

It is useless to deny that there is a popular prejudice against the profession. We frequently hear slurs and sneers directed against it, as if it were a profession of craft, of trick, of artifice, of dissimulation, in short, of untruth.

This prejudice is but the common fallacy of hasty generalization, founded upon exceptional cases, which often happen to be the cases most conspicuously in evidence. By the great body of the profession, by the immense majority of lawyers, the principles of truth, honor, sincerity, candor, fidelity to engagements, loyalty to clients, these virtues are held sacred. They are the cherished traditions of the profession.

We find of late years a marked tendency to demoralize the profession

and to lower its tone. We find the factors of degeneracy in a crowded bar, intense competition within, and an unfair competition from without. To counteract these tendencies the wholesome influence of Bar Associations, national, state and local, is constantly directed.

But the influence of the Bar Associations is necessarily limited. They can hardly be expected to amount to much as a disciplinary or coercive agency, for the very obvious reason that the names of those most likely to be candidates for expulsion are seldom or never to be found on their rolls, and over such cases their jurisdiction does not extend. The most that can be expected of Bar Associations in the direction indicated, besides their moral weight and influence, is the aid they can render in such investigations as the present, and in starting such investigations when cases are brought to their attention.

The profession must look to the courts to preserve unsullied the integrity and repute of the bar and to prevent it from losing the confidence of the public. The public looks to the courts for protection against the crafty schemes and unscrupulous and mercenary practitioners.

Painful, oppressively painful, is the responsibility that weighs upon a court charged with an investigation like this. No court can approach such a duty without a solemn sense of what it means to a lawyer to be placed on trial for his reputation and his means of life. Nor should he be deprived of either upon trivial charges or doubtful proof. The charges should be serious enough to involve a substantial breach of the admission oath. The proof should be plain enough to satisfy, not only the mind of the court, but the conscience and intelligence of the bar and the public.

On the other hand there should be no timid flinching from a painful duty, when the duty appears imperative. No court of justice can allow its judgment to be swayed from its bearings by sympathy or perverted by any personal considerations.

The attorneys now before the court are partners, but they have severed in their defences, their cases are not identical, and must be severally adjudicated.

To a great extent the condemnation of Charles Winternitz has been gathered from his own testimony. There is no more painful symptom of his unfitness for the profession than the placid unconcern, the complacent incapacity to realize their significance, with which we heard him make the most damaging admissions. His false representations to Harbaugh, in connection with the Jubb letters, that his partner had done professional work for Harbaugh's deceased brother in Baltimore, is perhaps the most striking illustration. It is certainly the one that caused the most astonishment.

Throughout the whole of his self-inculpating testimony there is not the slightest indication that he regarded such small matters as systematic concealment of material facts, and the exhibition of a series of shams and false pretences, in order to get business, entrap a client and make a fee, as anything at all out of the regular line of practice. We do not know what he really believes, but he has acted as if he believed that the unfounded popular prejudice against the profession as a profession of untruth and craft, truly expressed its real spirit and mission.

With the exceptions already noted of the second specification, we have no difficulty in finding that the charges prefered by the Orphans' Court, as against the said Charles Winternitz are to such an extent as to require his disbarment, and an order will accordingly be passed to strike off the name of the said Charles Winternitz from the roll of attorneys-at-law of Baltimore City.

The case of Augustin J. Quinn is one of more difficulty. It has been seen that his communication to Harbaugh over the wires misled that individual, and laid a foundation for the fraud afterwards perpetrated by Winternitz. There is an absence of proof that Quinn had direct participation in, or knowledge of, the various devices which composed that fraud, at the time when they were severally enacted, yet as the partner of Winternitz he shared in the illgotten gains of those devices, and retained the same after he must have had full knowledge thereof, and still retains them and by his answer herein endeavors to maintain his right so to do. By this series of acts he has thus ratified and adopted the fraudulent acts of his partner Winternitz, and so

made himself in legal contemplation equally liable with his partner.

But although in contemplation of law equally responsible with his partner, there is a marked difference in the degree of moral delinquency, which should be seen reflected in the degree of punishment. Morally Winternitz was much more culpable than Quinn. Winternitz was the active, managing partner, without whose personal agency, so far as the evidence goes, no fraud would have been perpetrated. The misleading effect of Quinn's telegraphing and telephoning would have amounted to nothing unless followed up by the devices of his partner. Of those devices, as has been said, there is no proof that Quinn had actual knowledge at the time.

All things considered, we conclude that his case calls for exemplary discipline, short of actual disbarment. He will be suspended from practice for the period of one year.

Reference has already been made to the surprising ignorance claimed by the parties for two days after the discovery of the money. If knowledge or means of knowledge of that fact should by any new testimony hereafter available be brought home to Mr. Quinn in time for him to have communicated with his partner, either before the departure of the latter for Illinois, as hereinbefore mentioned, or before the execution of the Springfield contract, that of course ought to have and would have a material bearing upon his case, and provisions for such contingency will be made in the order of suspension.